IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BRUCE B., | ) |
| | ) |
|         Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 22-CV-2923-SMY |
| | ) |
| KILOLO KIJAKAZI, | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
|         Defendant. | ) |

# MEMORANDUM AND ORDER

**YANDLE, District Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Bruce B.[1] seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits ("DIB") benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for DIB on March 25, 2015, alleging a disability onset date of July 3, 2013 (Tr. 153). His claim was initially denied on December 18, 2015 (Tr. 94) and denied again by an ALJ in a decision dated June 9, 2017 (Tr. 17-35). On July 31, 2017, Plaintiff submitted a timely request for review by the agency's Appeals Council (Tr. 151), but they denied the request on May 17, 2018 (Tr. 1).

Plaintiff filed a Complaint in federal court and this Court issued an order reversing and remanding the case for rehearing and reconsideration of the evidence (Tr. 629-641). Following

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and its Advisory Committee Notes.

rehearing, the ALJ issued an unfavorable decision dated October 21, 2019 (Tr. 539-561). Plaintiff filed exceptions with the Appeals Council (Tr. 508-515), but they denied review once again (Tr. 492). Pursuant to 20 CFR § 404.984, that decision of the ALJ became the final decision of agency, and Plaintiff filed the instant lawsuit.

## Issues Raised by Plaintiff

Plaintiff raises the following issue for judicial review:

1. The ALJ erred in assessing Plaintiff's residual functional capacity as a reduced range of light work.

## Legal Standard

To qualify for disability insurance benefits, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

In determining whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his or her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520. An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to

perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...." 42 U.S.C. § 405(g). Thus, the Court is not tasked with determining whether Plaintiff was disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for substantial evidence, the Court considers the entire administrative record, but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). At the same time, judicial review is not abject; the Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## Decision of the ALJ

On remand, the ALJ reconducted her analysis of whether Plaintiff was disabled and followed the five-step analytical framework with respect to Plaintiff's application. She determined that Plaintiff had not worked at the level of substantial gainful activity from the alleged onset date of July 3, 2013 through the date last insured of December 31, 2015 (Tr. 544). She found that Plaintiff had the severe impairments of broad-based protrusions of the C4-C5, C5-C6, and C6-C7 level with canal stenosis at C6-C7, with moderate arthritis and status post-anterior cervical discectomy and fusion with residual cervical radiculopathy, and

bilateral patellofemoral chondromalacia (Tr. 544-545) but concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the impairments listed in 20 C.F.R. Part 404 (Tr. 546). Specifically with respect to Listing 1.04, the ALJ noted, "I have also reviewed the claimant's spinal impairment under listing 1.04. Specifically, the medical evidence does not establish the requisite evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis as required under listing 1.04 for disorders of the spine through the date last insured" (Tr. 546).

The ALJ concluded as follows regarding Plaintiff's Residual Functional Capacity ("RFC"):

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he cannot climb ladders, ropes, or scaffolds, and he can occasionally climb ramps and stairs. The claimant can occasionally kneel, crouch, and crawl. He cannot perform overhead reaching, pushing, or pulling bilaterally. He can frequently handle and finger. The claimant should have no exposure to extreme vibration such as that from operating heavy equipment.

(Tr. 546)

The ALJ ultimately concluded that Plaintiff was not disabled based on his ability to perform past relevant work as a small business owner, which did not "require the performance of work-related activities precluded by the claimant's residual functional capacity" (Tr. 552). The ALJ also consulted the vocational expert who determined that Plaintiff could perform jobs available in the national economy of retail clerk and dining attendant (Tr. 554).

**The Evidentiary Record**

The Court reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

**Agency Forms**

Plaintiff was born in 1965 and was 48 years old on the alleged onset date of July 3, 2013 (Tr. 60). He filed for disability based on "cervical fusion and hardware placement, bilateral knee adema (possible surgery), limited head movement, numbing, tingling hands, muscle atrophy, loss of muscle strength" (Tr. 60).

Plaintiff submitted several forms pertaining to his disability with descriptions of his issues. On April 19, 2015, Plaintiff submitted a lengthy description in the Remarks section of Form SSA-3369-BK in which he wrote that, "I have been dealing with my neck and knee issues for approximately 7 years. Due to the absence of medical insurance was not able to get repaired so I continued to work . . . I was causing more damage to my neck and knees along with debilitating pain . . . . I have not been working due to debilitating pain in both my neck and knee and now have very limited R.O.M. in my neck" (Tr. 239).

On June 26, 2017, following an unfavorable disability decision, Plaintiff submitted a "Request for Review of Hearing Decision." Plaintiff objected to various paragraphs and noted that, "Because of my cervical issues, my ability to work and to perform my daily activities have been affected and have continued to affect my life and work ability and have been progressively getting worse since 2013" (Tr. 147). Plaintiff further noted that Dr. Poulos did not authorize him to return to work and that the state's doctors were incorrect as there "is absolutely no way for [Plaintiff] to sit/stand for any substantial length of time or push/pull

anything" (Tr. 149).  Plaintiff complained of his "nerve root compression" and "[spinal] nerve damage [that] causes sporadic muscle cramping causing [his] hand to draw up" (Tr. 149).

On October 23, 2019, following another unfavorable disability decision, Plaintiff submitted another "Request for Review of Hearing Decision" in which he objected to facts (Tr. 688-692).

**Evidentiary Hearings**

Plaintiff was represented by counsel at his first hearing on February 8, 2017 (Tr. 38) and testified to the following:  Plaintiff was 51 years old and a high school graduate with a little college education but no college degree (Tr. 41).  Previously, he had owned and operated a bar for six years in Marissa, Illinois while working for a concrete company as a cement truck driver (Tr. 42).  Plaintiff has also worked as a barber tool sharpener (Tr. 43).  In March 2015, he had a three-level fusion surgery that failed, causing nerve damage to his left arm (Tr. 44).  He could only do repetitive work with his right hand and had to lie down and rest for two or three hours a day (Tr. 44).  Because of related neck pain and "jarring of [his] neck," he could not drive far or stand for long periods of time (Tr. 44).

In response to questions posed by his counsel, Plaintiff testified that he had pain in his neck, with a pulling and burning sensation (Tr. 45).  His left arm cramped and he had no strength in his left hand (Tr. 45-46).  He had arthritis in his lower back and he had to lay down daily for two or three hours on "good days"; he was incapacitated on other days (Tr. 47). Plaintiff could only help his wife with chores for a few hours (Tr. 49-50).

After Plaintiff's testimony, a vocational expert ("VE"), Marianne Lumpy, testified that she had reviewed Plaintiff's work history and that he could still perform past jobs of a barber tool sharpener and a small business owner (Tr. 52-53).  The ALJ questioned the VE about

whether with a light RFC and unskilled and hand issues, Plaintiff could still perform any jobs in accordance with the Dictionary of Occupational Titles ("DOT"). The VE responded that Plaintiff could work as a school bus monitor, an usher, or a children's attendant (Tr. 54-55). Alternatively, Plaintiff could potentially perform his past work as a small business owner if he had sufficient bilateral dexterity or transfer those skills to clerical jobs (Tr. 55-56). Plaintiff's attorney questioned the VE. The VE conceded that if Plaintiff would be off task for 20% of the time, then it would eliminate competitive work (Tr. 57).

Plaintiff was once again represented by counsel at his hearing on remand on September 10, 2019 (Tr. 564). Prior to the start of the hearing, the ALJ confirmed that Plaintiff had issues with neck movement:

> Q. Right. Let me offer an observation before I go any further. When we were coming into the hearing room, and I called you, I noticed you were sitting in a chair, and you sat forward and turned your whole body –
> A. Um-hum.
> Q. – as opposed to turning your neck, and as we're sitting here, now –
> A. Right.
> Q. – you're turning your body as you want to look at me as opposed to turning your neck –
> A. Right.
> Q. – so that's a consequence of this neck injury that you have?
> A. Yes, one of them.

(Tr. 574-575).

The ALJ confirmed that Plaintiff had suffered an on-the-job neck injury around 2013 and suffered from the problem, without much treatment, until 2015 (Tr. 574). At that time, Plaintiff began seeing Dr. Nicholas Poulos (Tr. 575). Plaintiff initially had relief from a surgery but then continued having significant pain, lack of strength in his left arm, and numbness (Tr. 576). Plaintiff tried trigger point injections and physical therapy to no avail (Tr. 578). Plaintiff explained that if he had any break in his treatment since the surgery, it

would be because he lacked insurance (Tr. 579). Before that, Plaintiff had Medicaid and tried to set up appointments, but many doctors cancelled on him because they no longer accepted that insurance (Tr. 580).

The ALJ questioned a different VE, Brenda Young (Tr. 581). The ALJ initially had the VE assume a light work RFC. She said that Plaintiff could perform his past work as a small business owner as it is classified as light work (Tr. 583). Otherwise, Plaintiff could perform the light work category jobs of retail clerk, dining attendant, and small product assembly worker (Tr. 584). But if Plaintiff's RFC was sedentary, he would be disabled (Tr. 585-586). Following the VE's testimony, Plaintiff's attorney mentioned that Plaintiff was limited in that his doctor had opined he would miss "at least four days of work per month" (Tr. 587).

**Relevant Medical Records**

On July 3, 2013, Plaintiff had an MRI of the Cervical Spine at St. Elizabeth's Hospital, with impressions of "broad-based protrusions of C4-5 and C5-6 disc with moderate canal stenosis" and "broad-based protrusion of C6-7 disc with high grade canal stenosis" and "moderate arthritis" (Tr. 295).

On July 8, 2013, Plaintiff saw Dr. Nicholas Poulos at the Southern Illinois Brain and Spine Center (Tr. 338). Plaintiff reported neck pain into his left shoulder and left, loss of strength in his left hand, and numb fingers (Tr. 338). Plaintiff had trouble moving his head or sleeping (Tr. 338). Dr. Poulos diagnosed Plaintiff with a herniated cervical disk and a potential nerve impingement at C4-C7; he recommended a further CT Scan and potential surgical decompression but Plaintiff had issues with his finances (Tr. 338-339).

Although treatment from the year 2014 is largely omitted from the records, Plaintiff indicated that he did not have surgery at this time because of financial considerations. There are indications that Plaintiff saw Dr. Poulos, but for unrelated ailments (knee pain).

On January 15, 2015, Plaintiff visited the Belleville Family Medical Association Clinic for "cervical radiculopathy" and "herniated cervical disc" (Tr. 309). Dr. James Hitchcock diagnosed him with the same, prescribed pain medication, and advised him to check his neck with a neurosurgeon (Tr. 311).

On January 19, 2015, Plaintiff returned to Dr. Poulos and indicated that he had insurance that would cover the neck surgery (Tr. 340).

On February 9, 2015, Plaintiff had a cervical myelogram injection using fluoroscopic guidance at St. Elizabeth's Hospital with findings of "prominent impression upon the ventral thecal sac at C4-5 and C5-6 suggesting posterior spurs and posterior disc bulge or protrusion" (Tr. 296).

On March 4, 2015, Dr. Poulos recommended a C4-5, C5-6 and C6-7 anterior cervical diskectomy, interbody fusion, plate stabilization but also warned Plaintiff that, "Given the chronicity of his weakness in his left arm, some component of [his symptoms] may be reversible but alternatively his deficits may in fact be permanent" (Tr. 301).

On the same day, Plaintiff underwent C4-5, C5-6 and C6-7 anterior cervical diskectomy for decompression of spinal cord and nerve roots, interior interbody fusion of three (3) levels with cervical spacer and lumbar plate fixation, demineralized bone matrix, bone graft and bone putty (Tr. 298). The preoperative and postoperative diagnoses were both "C4-5, C5-6, and C6-7 cervical disk herniations" (Tr. 304).

On March 12, 2015, Plaintiff was provided with a bone stimulator for post-surgery and he reported that his left radiculopathy was fifty percent (50%) improved (Tr. 346).

On April 3, 2015, Plaintiff reported that the improvement from the surgery had abated, with a return of pre-surgery pain and numbness, numbness and tingling in Plaintiff's left arms, hand cramps, and pain at the bend of the left elbow and bicep of the left arm (Tr. 348). Dr. Poulos acknowledged that, "I suspect the patient because of chronic nerve compression has some rebound nerve irritation" (Tr. 348).

On May 5, 2015, Plaintiff had an X-ray of the cervical spine with findings of "postsurgical changes of anterior cervical fusion traversing C4-C7 are again seen. No periprosthetic lucency to suggest hardware loosening or failure" (Tr. 439). On May 28, 2015, Plaintiff had another of the same type of X-ray with findings of "anterior fusion plate and vertebral body screws are seen along with interbody fusion cages at the C4-C7 levels. There is normal alignment. There is no vertebral disc space narrowing. There are no subluxations" (Tr. 441). Finally, on August 11, 2015, a repeat of this X-ray showed "stable postsurgical appearance of C4-C7 fusion with no periprosthetic lucency" (Tr. 443-444).

On September 30, 2015, Plaintiff treated at St. Elizabeth's Hospital for "myofascial pain" and had "trigger point injections in the left trapezius muscles and cervical region" (Tr. 480).

On November 12, 2015, Plaintiff underwent an EMG and NCV testing of the upper limbs that found, "Chronic left C5, C6, C7 radiculopathy" (Tr. 414).

On November 30, 2015, Plaintiff complained to Dr. Poulos that the trigger point injections did not help (Tr. 476). The history section of the medical record indicates that his pain was initially 50% better, he was cleared to return to work (but was unable to return), and

he owned and operated a bar (Tr. 476). But the same history section indicates "chronic left C5, C6, C7 radiculopathy" and audible crack of his head, and positive Phalen's test and Apley scratch test that demonstrate left-sided neck, shoulder, and arm pain (Tr. 476).

On April 20, 2016, Plaintiff underwent an MRI of the Cervical Spine that found, "ACDF at C4-C7. No significant spinal canal stenosis. Facet and uncovertebral hypertrophy results in multilevel foraminal narrowing, as detailed above" (Tr. 448).

On November 13, 2016, Plaintiff underwent a CT of the Cervical Spine following a motor vehicle accident that found, "No evidence of fracture or dislocation is seen," with an overall impression of "postoperative changes cervical spine without evidence of fracture or dislocation" (Tr. 470). The motor vehicle accident caused him neck pain after his car was rear-ended by someone driving erratically at a gas station (Tr. 462).

On December 12, 2016, Plaintiff had a "second opinion for posterior fusion" at Barnes Jewish Hospital in St. Louis where Plaintiff indicated that he feels worse after surgery than before it, with chronic neck pain, left arm pain, and clumsy hands (Tr. 472). He had been unable to keep up with his bar business because of neck complaints and had tried physical therapy and trigger point injections without relief (Tr. 472). The impression included "left upper extremity polyradiculopathy" (Tr. 472). Plaintiff was uninterested in a further surgery (Tr. 473).

On June 19, 2017, Plaintiff went to Dr. James Hitchcock of Belleville Family Medical Associates, Ltd. for an annual check up and he described "severe neck pain with radiculopathy" that is "very disruptive to even minor daily activities" (Tr. 748, 751).

On June 30, 2017, Dr. James Hitchcock submitted a letter on behalf of Plaintiff in which he noted that, "[Plaintiff] is a patient of mine who has cervical spine stenosis with cervical

radiculopathy, classified as severe in nature. He is limited in daily activities and is unable to work on a sustained basis . . . . [He] was diagnosed with high grade canal stenosis in 2013 with an injury and symptoms since at least 2009" (Tr. 747). Dr. Hitchcock listed a litany of Plaintiff's symptoms and limitations, including that Plaintiff could stand less than two hours in a workday and would have to miss "at least four days of work per month as a result of his impairment" (Tr. 747).

On July 2, 2019, Plaintiff visited James Hitchcock for a health maintenance evaluation and stated that he had only returned after several years because of a "lot of insurance issues in the interim" (Tr. 773). He had still been having "severe neck pain" with left arm radiculopathy and had "4 episodes in the past 6 months where he will wake up and cannot move his left arm at all" (Tr. 773).

There is an undated letter in the file from Michael D. Halde, the owner of Computer Assisted Bookkeeping, which stated that the bar owned by Plaintiff began operating on July 24, 2009 and ceased on September 28, 2014, and that Computer Assisted Bookkeeping "provided accounting and tax services for the duration of said business" (Tr. 693).

**State Agency Consultants' Opinions**

Maria Wilson opined on June 26, 2015 that Plaintiff had exertional limitations but could stand or sit for 6 hours in an 8-hour workday (Tr. 64-65).

On December 17, 2015, Dr. LaVerne Barnes determined, on reconsideration, that, "Based on the totality of evidence in file, with great weight given to Tx source of Dr. Poulos of Southern IL Brain and Spine, clmnt is capable of performing work at the light exertional level" (Tr. 74).

**Discussion**

Plaintiff asserts that the ALJ failed to consider the relevant medical evidence demonstrating that he should have been limited to sedentary and not light work. Plaintiff points to evidence that the ALJ overlooked, including but not limited to findings of Dr. Poulos that the deficits may be permanent, Plaintiff's reports of pain and deterioration after the surgery, positive Phalen's and Apley tests, and the audible cracking of the head region when PA Amelia Gerke treated Plaintiff (Doc. 18, p. 12). Plaintiff further asserts that the ALJ did not develop the record of Plaintiff's treatment in 2014, if any.

When assessing a claimant's RFC, the ALJ must "evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano v. Astrue,* 556 F.3d 558, 563 (7th Cir. 2009). The ALJ also "must give substantial weight to the medical evidence and opinions submitted, unless specific, legitimate reasons constituting good cause are shown for rejecting it." *Knight v. Chater,* 55 F.3d 309, 313-314 (7th Cir. 1995). An omission is significant, and requires remand, only if is prejudicial; plaintiff is required to demonstrate prejudice by "[setting] forth specific, relevant facts—such as medical evidence—that the ALJ did not consider." *Nelms v. Astrue,* 553 F.3d 1093, 1098 (7th Cir. 2009).

Most of the evidence Plaintiff refers to is from a November 30, 2015 visit with Amelia Gierke PA-C (Tr. 476-478), which is only discussed intermittently in the ALJ's decision. Defendant does not dispute that these are hardly referenced but argues the ALJ's decision is otherwise sound and that reversing it requires reweighing the evidence (Doc. 23, p. 6).

"Although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). The ALJ

must consider all relevant evidence. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). Moreover, "[i]n considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Kastner v. Astrue,* 697 F.3d 642, 647 (7th Cir. 2012).

Here, Plaintiff's main bases for claiming disability are issues with moving his neck and left arm radiculopathy. A relevant listing is Listing 1.04A[2], which requires compromise of a nerve root or spinal cord, and "[e]vidence of nerve root compression, characterized by neuroanatomic distribution of pain, limitation of motion of the spine, motor loss . . . accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raising test." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04A. While Plaintiff has the burden of showing that his impairments satisfy all of the various criteria specified in the listing. *Maggard v. Apfel,* 167 F.3d 376, 380 (7th Cir. 1999), an ALJ should mention the specific listings they are considering and a failure to do so, if combined with a "perfunctory analysis," may require a remand. *Barnett v. Barnhart,* 381 F.3d 664, 668 (7th Cir. 2004).

Here, although the ALJ mentions Listing 1.04, the Court finds that the ALJ's two sentence discussion of the listing was inadequate, especially in light of Dr. Hitchcock's mention of Plaintiff's severe cervical radiculopathy. *Id.* Similarly, Dr. Poulos noted, "I suspect the patient because of chronic nerve compression has some rebound nerve irritation" (Tr. 348). There was also significant evidence of stenosis and limitation of motion of the spine that should have addressed at greater length when discussing Listing 1.04. While the ALJ can conduct the discussion of the listing by analyzing the medicals in other sections of their

---

[2] This listing was more recently modified to Listing 1.15 with a new set of requirements. However, the ALJ analyzed Plaintiff's disability under the old listing of 1.04.

opinion, here, the ALJ only discussed the admitted "chronic left C5-C7 radiculopathy" and "limited range of motion in [Plaintiff's] neck due to stiffness and pain" in a cursory way in other sections and did not adequately develop the record of how Plaintiff has possible nerve root compression and limited range of motion. *Zellweger v. Saul*, 984 F.3d 1251 (7th Cir. 2021) (discussing step-three discussions and RFC analyses).

For the foregoing reasons, remand is appropriate in this case for the ALJ to fully address Plaintiff's issues with radiculopathy/nerve root compression and limited range of motion. Because the Court has determined that remand is necessary, it need not address Plaintiff's remaining arguments. Plaintiff may raise those issues directly with the ALJ on remand.

## Conclusion

After careful review of the record, the Court finds that the ALJ committed errors of law. Therefore, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of Court shall enter judgment in favor of Plaintiff.[3]

**IT IS SO ORDERED.**

**DATED: March 30, 2024**

*Staci M. Yandle*

**STACI M. YANDLE**
**United States District Judge**

---

[3] This Memorandum and Order should not be construed as an indication that the Court believes that Plaintiff is disabled or that she should be awarded benefits. The Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.